1                    UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF CALIFORNIA

3

4 UNITED STATES OF AMERICA,      )  Case No. 09CR1209-H
                                 )
5            Plaintiff,          )  San Diego, California
                                 )
6 vs.                            )  Wednesday,
                                 )  April 8, 2009
7 BELL, et al.,                  )  10:00 a.m.
                                 )
8            Defendants.         )
  ───────────────────────────────)
9

10                  TRANSCRIPT OF ARRAIGNMENT
             BEFORE THE HONORABLE NITA L. STORMES
11              UNITED STATES MAGISTRATE JUDGE

12 APPEARANCES:

13 For the Plaintiff:          TODD ROBINSON, ESQ.
                               NICOLE JONES
14                             Assistant United States
                                Attorney
15                             880 Front Street
                               San Diego, California 92101
16
   For the Defendant:          FEDERAL DEFENDERS OF SAN DIEGO
17                             By:  DEVON BURSTEIN, ESQ.
                               225 Broadway, Ninth Floor
18                             San Diego, California 92101
                               (619) 234-8467
19
   Transcript Ordered by:      STEPHEN P. WHITE, ESQ.
20
   Transcriber:                Jordan Keilty
21                             Echo Reporting, Inc.
                               6336 Greenwich Drive, Suite B
22                             San Diego, California 92122
                               (858) 453-7590
23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

1

1    SAN DIEGO, CALIFORNIA  WEDNESDAY, APRIL 8, 2009 10:00 A.M.

2                          --oOo--

3        (Call to order of the Court.)

4            THE CLERK:  Calling matter number one off the log,

5    Case Number 09CR1209-H, United States versus Michael Ivy,

6    Stanley Gentry, Billie Bishop, Diana Jaime, Jorge Cortez,

7    Lorena Callu, Anton Ewing, Dennis Tapia, Desiree Holiday,

8    Dexter Holiday, Keith Holiday, Ray Logan, David Lewis,

9    Joseph Lewis, Gerard Holiday, Stevie Frazier, Jorge Magana,

10   Nicoele Watson, and Daniel Williams, all on the log for

11   arraignment on the indictment.

12           MR. BURSTEIN:  And good morning, your Honor.

13   Devon Burstein for Federal Defenders, on behalf of all log

14   matters today --

15           THE COURT:  Good morning.

16           MR. BURSTEIN:  -- or this morning at least.

17           MR. ROBINSON:  Good morning, your Honor.  Todd

18   Robinson and Nicole Jones on behalf of the United States.

19           THE COURT:  Good morning.

20           We have a few more individuals to bring up.

21           MR. ROBINSON:  What I was going to ask is for a

22   moment.  As I'm sure you can imagine, it has been crazy

23   downstairs.

24           MR. BURSTEIN:  Your Honor, may I approach with a

25   conflict list?

2

1          THE COURT:  Yes, please.

2      (Pause.)

3          THE CLERK:  We have a Michael Ivy, Stanley Gentry,

4  Billie Bishop, Diane Jaime, Jorge Cortez, Lorena Callu,

5  Anton Ewing, Dennis Tapia, Desiree Holiday, Dexter Holiday.

6          DEFENDANT DEXTER HOLIDAY:  Here.

7          THE CLERK:  Keith Holiday?

8          DEFENDANT KEITH HOLIDAY:  Here.

9          THE CLERK:  Ray Logan?

10          DEFENDANT LOGAN:  Here.

11          THE CLERK:  David Lewis?

12          DEFENDANT D. LEWIS:  Here.

13          THE CLERK:  Joseph Lewis?

14          DEFENDANT J. LEWIS:  Yeah, right here.

15          THE CLERK:  Gerard Holiday, Stevie Frazier, Jorge

16  Magana, Nicoele Watson, and Daniel Williams?

17          DEFENDANT WILLIAMS:  Here.

18          THE COURT:  All right.  Good morning, ladies and

19  gentlemen.  Each of you is here today because you've been

20  charged by way of a federal indictment with conspiracy to

21  conduct enterprise affairs through a pattern of racketeering

22  activity and criminal forfeiture.

23          You're not required to make any statement about

24  these charges today, and I should caution you if you were to

25  make a statement, it might later be used against you.

3

1          You have the right to be represented by an

2 attorney throughout the proceedings.  If you cannot afford

3 to hire an attorney, the Court will appoint one for you at

4 no cost to you.

5          Unless the Government proves that you are either

6 dangerous or likely to flee and not show up for court, you

7 also have the right to have this Court set reasonable

8 conditions for your release from jail.

9          All right.  Mr. Perrault, would you please arraign

10 each of these individuals on the indictment.

11          THE CLERK:  Yes, your Honor.  Will you please

12 raise your right hand.  Do you each solemnly swear the

13 evidence you shall give in the cause before the Court shall

14 be the truth, the whole truth, and nothing but the truth, so

15 help you God?

16          DEFENDANTS:  Yes.

17          THE CLERK:  Okay.  You may put your hands down.

18          Michael Ivy, is that your true name?

19          DEFENDANT IVY:  Yes.

20          THE CLERK:  Stanley Gentry, is that your true

21 name?

22          DEFENDANT GENTRY:  Yes.

23          THE CLERK:  Billie Bishop, is that your true name?

24          DEFENDANT BISHOP:  Yes.

25          THE CLERK:  Diana Jaime, is that your true name?

4

1          DEFENDANT JAIME:  Yes.

2          THE CLERK:  Jorge Cortez, is that your true name?

3          DEFENDANT CORTEZ:  Yes.

4          THE CLERK:  Lorena Callu, is that your true name?

5          DEFENDANT CALLU:  Yes.

6          THE CLERK:  Anton Ewing, is that your true name?

7          DEFENDANT EWING:  Yes.

8          THE CLERK:  Dennis Tapia, is that your true name?

9          DEFENDANT TAPIA:  Yes.

10          THE CLERK:  Desiree Holiday, is that your true

11 name?

12          DEFENDANT DESIREE HOLIDAY:  Yes.

13          THE CLERK:  Dexter Holiday, is that your true

14 name?

15          DEFENDANT DEXTER HOLIDAY:  Yes.

16          THE CLERK:  Keith Holiday, is that your true name?

17          DEFENDANT KEITH HOLIDAY:  Yes.

18          THE CLERK:  Ray Logan, is that your true name?

19          DEFENDANT LOGAN:  It's Ray Anthony Logan.

20          THE CLERK:  Ray Anthony.  David Lewis, is that

21 your true name?

22          DEFENDANT LEWIS:  Yes.

23          THE CLERK:  Gerard Holiday, is that your true

24 name?

25          DEFENDANT HOLIDAY:  Yes.

5

1          THE CLERK:  Stevie Frazier, is that your true

2  name?

3          DEFENDANT FRAZIER:  Yes.

4          THE CLERK:  Jorge Magana, is that your true name?

5          DEFENDANT MAGANA:  Yes.

6          THE CLERK:  Nicoele Watson, is that your true

7  name?

8          DEFENDANT WATSON:  Yes.

9          THE CLERK:  And, Daniel Williams, is that your

10  true name?

11          DEFENDANT WILLIAMS:  Yes.

12          THE CLERK:  You're each hereby informed that an

13  indictment has been filed charging you each with conspiracy

14  to conduct enterprise affairs through a pattern of

15  racketeering activities and criminal forfeiture.

16          Counsel, have you received a copy of this

17  indictment, and do you waive further reading?

18          MR. BURSTEIN:  I have and so waive.

19          THE CLERK:  You are each further informed that you

20  have the right to be represented by counsel at all

21  proceedings before the Court.  You have the right to remain

22  silent, the right to a trial by jury.  You have the right to

23  confront and cross examine any witnesses who testify against

24  you, and you each have the right to have witnesses

25  subpoenaed to testify on your behalf.

6

1          Now, how do you each plead to the counts in the

2   indictment in which you are named, starting with --

3          MR. BURSTEIN:  Please enter a not guilty plea on

4   behalf of all Defendants.

5          THE COURT:  The Court will enter a not guilty plea

6   to the indictment all counts on behalf of each of these

7   individuals.

8          Now, with regard to Mr. Michael Ivy, is he

9   requesting appointment of counsel?

10          MR. BURSTEIN:  He is, your Honor.  And at this

11   point we'd ask you for a provisional counsel for all.

12          THE COURT:  This is what the Court intends to do.

13          MR. BURSTEIN:  Okay.

14          THE COURT:  I will provisionally appoint counsel

15   for each of these individuals.  I will require that a

16   financial affidavit be filed under seal in light of the

17   allegations in this case within -- let's see, by next

18   Tuesday, April 14.

19          MR. BURSTEIN:  And, your Honor, you know, my

20   understanding is that is this all going to be all CJA

21   appointments?

22          THE COURT:  Well, Federal Defenders is not on the

23   conflicts list.  So they can represent at least one of the

24   Defendants in the case.

25          MR. BURSTEIN:  Okay.  Because I was just going to

7

1  just -- for the purposes of letting everybody know about the

2  financial affidavit, the specific requirement in this case,

3  perhaps a minute order in the -- in the docket sheet would

4  be helpful.

5         THE COURT:  A minute order as to what?

6         MR. BURSTEIN:  When the conditions are set

7  specifying --

8         THE COURT:  Well, the minute order will specify

9  when the financial affidavit has to be submitted to the

10  Court.  I will ask Pretrial Services to monitor compliance

11  with that request.

12         MR. BURSTEIN:  And I was just going to say under

13  seal because most people are --

14         THE COURT:  Yes, it will be in the minute order.

15         MR. BURSTEIN:  Thank you, your Honor.  That's all.

16         THE COURT:  The Court will provisionally appoint

17  Attorney Bernard Skomal for Michael Ivy, Attorney Paul Blake

18  for Stanley Gentry, Attorney Steven White for Billie Bishop,

19  Federal Defenders for Diana Jaime, Holly Sullivan for Jorge

20  Cortez, Lisa Baughman for Lorena Callu, Gregory Obenauer for

21  Anton Ewing --

22         MR. BURSTEIN:  Your Honor, one private counsel is

23  present who's already been retained for Mr. --

24         MR. MOORE:  Your Honor, Todd Moore. I'm counsel

25  for Mr. Jorge Cortez.  I have not had a chance to speak with

8

1  him since he's been arrested.  I --

2          THE COURT:  Would you come forward, please, to the

3  podium.  Your name, sir?

4          MR. MOORE:  Todd Moore.

5          THE COURT:  And you are making an appearance on

6  behalf of Jorge Cortez?

7          MR. MOORE:  Yes, I'll make a limited appearance.

8  I'd like to speak with him first.  I have not had a chance

9  to do that.  So he's been arraigned.  I understand counsel's

10  been provisionally appointed.  I can speak with him after

11  this, and then I can address it at the next hearing.

12          THE COURT:  Well, you can go talk to him whenever

13  you wish.  You're not making an appearance at this time

14  unless you're making an appearance both for this appearance

15  and for the next appearance.

16          MR. MOORE:  I understand.  I came forward at the

17  request of Federal Defenders.  I was trying to see him, and

18  I had been unable to see him.  That's all I'm saying.

19          THE COURT:  All right.

20          MR. MOORE:  So it's still Holly Sullivan then,

21  your Honor?

22          THE COURT:  That's correct.

23          MR. MOORE:  Thank you.  Sorry.

24          THE COURT:  You're welcome.

25          Where was I, George?

9

1          THE CLERK:  You were on number 13, Mr. Tapia I

2 believe.

3          THE COURT:  Mr. Tapia, okay.  Attorney Antonio

4 Yoon for Dennis Tapia.  Attorney Lynn Ball for Desiree

5 Holiday.  Attorney Mayra Garcia for Dexter Holiday.  David

6 Bartick for Keith Holiday.  Lisa Damiani for Ray Anthony

7 Logan.  Debra DiJorio for David Lewis.  Robert Schlien for

8 Joseph Lewis.  William Burgener for Gerard Holiday.  Michael

9 Burke for Stevie Frazier.  Joan Bader for Jorge Magana.

10          MR. BURSTEIN:  That was Joan Bader?

11          THE COURT:  Correct.  Keith McMullan -- or, sorry

12 -- Kenneth McMullan for Nicoele Watson, and Thomas Sims for

13 Daniel Williams.

14          MR. BURSTEIN:  Your Honor, how would you like to

15 address providing cards to the Defendants?  Do you want to

16 take the time and do that now?

17          THE COURT:  I think what we'll do is I'm going to

18 ask Mr. Robinson to give a proffer as to the general

19 background of this indictment and then make a bail

20 recommendation with regard to each of these individuals.

21          MR. ROBINSON:  Yes, your Honor.

22          THE COURT:  As far as getting cards to them, I'll

23 make sure they get cards for their attorneys before they're

24 taken back.  And maybe you can give those out.

25          MR. BURSTEIN:  Are you going to want to hear from

10

1   me on bail or no?

2          THE COURT:  Of course.

3          MR. BURSTEIN:  Okay.  That's fine.

4          THE COURT:  This isn't a running dialogue.  All

5   right.

6          Mr. Robinson?

7          MR. ROBINSON:  Your Honor, did the Court want to

8   proceed first with the request for detention?  There will be

9   a number of those.

10         THE COURT:  All right.  Are there any requests for

11  detention?

12         MR. ROBINSON:  Yes, there are, your Honor.  The

13  United States would move for detention against Defendant

14  Desiree Holiday, number 14, based upon risk of flight.

15         THE COURT:  All right.

16         MR. ROBINSON:  Defendant Dexter Holiday, Defendant

17  number 15, on both risk of flight and danger to the

18  community, Defendant Keith Holiday, number 16 on the

19  indictment as to both danger to the community and risk of

20  flight, Ray Logan, Defendant number 17, on both grounds,

21  your Honor, David Lewis, Defendant number 18, on both

22  grounds -- I'm sorry -- yes.  Joseph Lewis, Defendant number

23  19, on both grounds, Gerard Holiday, Defendant number 20, on

24  both grounds, and Stevie Frazier, Defendant number 21, on

25  both grounds, and we would request that the Court set that

11

1 three days in the future.

2          THE COURT:  Okay.  I assume that the defense may

3 want five days, counsel?

4          MR. BURSTEIN:  That would be excellent, your

5 Honor.

6          THE COURT:  All right.

7          MR. BURSTEIN:  And, again, if I can just -- if we

8 can go through that list so that I can mark it on the

9 sheets.

10     (Pause.)

11          THE COURT:  All right.  Counsel, my courtroom

12 deputy is going to help you pull the cards.

13          MR. BURSTEIN:  Thank you, your Honor.

14          THE COURT:  As far as the detention hearing is

15 concerned, I'm going to set the detention hearing for each

16 of the Defendants that Mr. Robinson identified for Wednesday

17 morning, April 15, at 9:00 o'clock in the morning, and the

18 individuals will be Desiree Holiday, Dexter Holiday, Keith

19 Holiday, Ray Anthony Logan, David Lewis, Joseph Lewis,

20 Gerard Holiday, and Stevie Frazier.

21          Did I miss anyone?

22          MR. ROBINSON:  No.  That is correct, your Honor.

23          THE COURT:  All right.  And all of those will be

24 based on risk of flight and danger to the community I

25 believe as to all except Desiree Holiday?

12

1          MR. ROBINSON:  That is correct, your Honor.

2          THE COURT:  All right.  Those will be set

3  Wednesday, April 15, 9:00 o'clock in the morning.

4          MR. ROBINSON:  Thank you, your Honor.

5          THE COURT:  All right.  Now, with regard to those

6  individuals for whom the Government has not moved for

7  detention, beginning first with Mr. Ivy.

8          MR. ROBINSON:  Yes, your Honor.  If it's

9  acceptable to the Court, what I'd like to do is make a

10 generalized proffer as to the nature and circumstances of

11 this case and then a particularized recommendation as to

12 each of the Defendants we're not seeking detention against.

13         THE COURT:  That would be helpful.  Thank you, Mr.

14 Robinson.

15         MR. ROBINSON:  Your Honor, as alleged in the

16 indictment, the 24 Defendants participated in a racketeering

17 enterprise, and basically the scheme was to defraud lending

18 institutions by purchasing fraudulently various properties

19 throughout San Diego County.  There were approximately 220

20 different properties, and those properties, the value of

21 those properties, the loans that were obtained fraudulently

22 exceeded $100,000,000.

23         As alleged in the indictment, the scheme depended

24 upon an entity or false business called Bell Construction,

25 and that was maintained by lead Defendant Darnell Bell.  The

13

1  indictment alleges that $9,000,000 -- in excess of

2  $9,000,000 was funneled into the Bell Construction account.

3  The forfeiture allegation in the indictment has amount of

4  $11,000,000, and the $9,000,000 is subsumed within that

5  $11,000,000 amount, and that's relevant for purposes of how

6  the guideline calculations would proceed according to this

7  case.

8          For a racketeering offense, the base offense level

9  is 19.  However, it cross-references the fraud guidelines

10 because those guidelines would be in excess of 19.  At a

11 loss amount of $9,000,000 -- and that's a very conservative

12 loss calculation, and I'll go into that in just a second --

13 with the adjustments for over 50 victims in this case, it

14 would result in a base offense level of 31.  The low end of

15 31, assuming that any given Defendant has no criminal

16 history, would be 108 months in custody, with a high end of

17 135 months.

18          So that's generally speaking the parameters of

19 what the Defendants are facing given the nature and

20 circumstances of the charge in this case.

21          With respect to each Defendant's role in the

22 offense, it varied according to Defendant, and I'd like to

23 address the specific role when I make the recommendation for

24 a specific amount of bond.

25          The defrauded institutions, as I mentioned

14

1 earlier, there were in excess of 70 different institutions

2 that lost money as part of this scheme, and if I could

3 address for a second the way in which the loss calculation

4 -- the $9,000,000 is just the money that was funneled into

5 the Bell Construction account.  And the scheme proceeded as

6 follows.

7       Basically, the enterprise would identify a piece

8 of property that had been on the market for, say, six

9 months.  And I'm not speaking to any particular piece of

10 property, just in general terms.  In this hypothetical, the

11 property would be reduced in its original asking price from,

12 say, $600,000 to $500,000.  The enterprise would then go in

13 and make a full price offer to the seller, that is $500,000.

14 The enterprise, the straw purchaser employed by the

15 enterprise would then enter into a side agreement with the

16 seller, and they would obtain a false appraisal for that

17 property at $600,000.  The straw purchaser would obtain a

18 loan from a financial institution or other lending

19 institution in the amount of $600,000, the appraised value

20 of the property.

21       So at the close of escrow, the $500,000 would go

22 to the seller, and the additional $100,000 would go to Bell

23 Construction, ostensibly for handicap upgrades to the

24 property.  As alleged in the indictment, that, of course,

25 was never done with respect to any of the properties, and

15

1  lead Defendant Darnell Bell would then take the $100,000,

2  pay the straw purchaser for their participation in the

3  scheme, pay the appraiser for the false appraisal that was

4  done, and there were also individuals who submitted false

5  verifications of employment, also known as CPA letters, to

6  the lending institutions to backstop the false information

7  in the loan applications by the straw purchasers.

8          So in terms of the racketeering activity, the

9  pattern of racketeering activity alleged in the indictment

10 is wire fraud, bank fraud, and money laundering, the 1957

11 money laundering, that is, $10,000 in direct proceeds from

12 the illegal activity being funneled into various bank

13 accounts, and the indictment has a host of overt acts which

14 allege the various events which constitute the pattern of

15 racketeering activity.

16         So that would be the overall scheme that was

17 employed, and essentially that scheme was repeated

18 approximately 220 times over the course of the enterprise's

19 existence and the conspiracy charged in the indictment.

20         So the straw purchasers who were employed by the

21 enterprise obtained loans in excess of $100,000,000 from

22 various banks, and they defaulted on all of those mortgages.

23 All of the 220 properties went into foreclosure, which

24 brings me to the loss calculation.

25         When I proffered to the Court that the loss is

16

1  $9,000,000, that's not the true extent of the loss, because

2  that's just the money that was skimmed off the top at the

3  time of escrow, the kickback scheme to the enterprise.

4         What the loss is really calculated as is the

5  selling price after foreclosure.  So in my hypothetical that

6  I gave the Court, the bank had a $600,000 loan which was

7  only secured by a $500,000 piece of property.  When that

8  piece of property went into foreclosure, there are costs

9  associated with that foreclosure, and ultimately given the

10 decline in the market, that property sold for approximately

11 250, 300 thousand dollars.

12        So the loss amount in this case far exceeded the

13 $100,000 kickback.  The loss is actually properly reflected

14 in the ultimate selling price after foreclosure of that

15 piece of property.  So when I estimate for the Court the

16 base offense level calculation at a level 31, that's

17 actually a very conservative estimate with respect to the

18 loss in this case.

19        So turning the Court's attention to the respective

20 roles of the Defendants, starting with Mr. Michael Ivy,

21 Defendant number two in the indictment, the Government is

22 recommending a property bond secured by $1,000,000 in real

23 property, and the first four Defendants on the indictment

24 were the critical participants in the enterprise.

25        What Defendant Ivy did was primarily he negotiated

17

1  for the sale of all the pieces of property.  The straw
2  purchasers would be recruited.  Defendant Ivy would then
3  send an offer to the seller, and that offer would include
4  the kickback amount to Bell Construction.

5          So Mr. Ivy, Defendant number two, was well aware
6  of the extent of the fraud.  He was well aware of the
7  amounts that were being funneled back to the Bell
8  Construction account, and he personally benefitted
9  significantly in financial terms from his participation, and
10  we've directly traced in excess of $200,000 being deposited
11  into his account during the course of the enterprise's
12  existence.

13          And when I reference the monetary amounts, this is
14  only what we have at this particular time that we could
15  prove beyond a reasonable doubt.  Obviously, with the extent
16  of this fraud, there were additional bank accounts.  There
17  were additional monetary transactions, and much of it was
18  done on a cash basis.  The monetary amounts that I'm going
19  to reference during this entire proffer are either wire
20  transfers, checks, or other deposits that we were able to
21  verify.  So the hand-to-hand money transactions are not
22  included within the Government's proffer with respect to the
23  financial aspect of this case.

24          Defendant Ivy also has property interests outside
25  of the Southern District of California, and with respect to

18

1  all of the Defendants in this case, the Government's -- I'm

2  sorry, with two exceptions, the Government's recommendation

3  is going to be that the bond amounts are secured by real

4  property.

5          And this case poses a very unique set of

6  circumstances because the Defendants, as I noted, are facing

7  a tremendous amount of time in custody.  For those that have

8  done time before, we are seeking detention by and large

9  against the Defendants who have lengthy criminal history.

10 So those aren't part of this proffer.  But for the other

11 Defendants, there's a strong incentive for them to flee and

12 not face the charges in this case because of the extent of

13 the fraud that was involved and the resulting exposure that

14 they have under the sentencing guidelines, and signatures in

15 and of themselves, given the fact that many of the

16 Defendants in their participation in this conspiracy sign

17 false documents, signed things that were absolutely untrue,

18 and the nature of the fraud itself calls into question any

19 signature bond that could be posted in this particular case,

20 I think it's necessary given their participation and given

21 their demonstrated willingness to falsify documents and not

22 be true to their word that it be secured by real property if

23 the Court sets bond in this matter.

24          THE COURT:  Well, Mr. Robinson, how am I to avoid

25 mini trials on documents submitted in support of property

19

1  bonds in this case?

2          MR. ROBINSON:  It is a problematic aspect, and we

3  would be requesting a Nebia Hearing with respect to a number

4  of the properties, and we've done our homework, quite

5  frankly.  And if they try to post properties that we've

6  identified as part of this scheme that were fraudulently

7  obtained, we will, of course, bring that to the Court's

8  attention.

9          So it is somewhat ironic, I concede to the Court,

10 that given the nature of this case, the property bond that's

11 being used to secure their release from custody, but

12 really --

13         THE COURT:  What about the alternative of a cash

14 or corporate surety bond?

15         MR. ROBINSON:  I don't think that that will have

16 the necessary coercive effect on the Defendants.

17 Particularly what the Government is looking for here is for

18 their family members to post their -- their primary

19 residences to secure these bonds.  And I think if and only

20 when that is done that that is going to serve to ensure this

21 Court that they make their future court appearances, because

22 I think that if they post their own primary residences, many

23 of the Defendants' primary residences are in foreclosure or

24 they're in rental properties so that they can't post their

25 own primary residences, but we have extensive information

20

1  about their family members, and that is who we're seeking to

2  have on the bond in this case, so that they run the very

3  real risk of their family members becoming -- or their

4  family members being adversely affected if they choose to

5  either violate the conditions of release or not make their

6  future court appearances.

7            THE COURT:  All right.

8            MR. ROBINSON:  And, again, your Honor, as is

9  always the case, setting an amount is a somewhat arbitrary

10 process, and we pegged that amount to not only their

11 involvement in this case and the fraud that was perpetrated

12 by each particular Defendant but also their role in the

13 offense and the amount of money that they made pursuant to

14 their participation in the offense.

15           So if -- for example, Mr. Michael Ivy, if the

16 Court were inclined to follow the Government's

17 recommendation and have $1,000,000 secured by real property,

18 if he had two family members that could post 795, that's, of

19 course, something that I think would reasonably secure his

20 appearance at future court proceedings.  So it's not the

21 monetary amount.  It's really what is going to make these

22 Defendants come to their court appearances and abide by the

23 conditions of release.

24           THE COURT:  All right.  Let me ask defense counsel

25 for a proffer with regard to Mr. Ivy at this point.

21

1           MR. BURSTEIN:  Yes, your Honor.  I think Mr.

2  Robinson said two important things.  One, he said what's

3  important to him is not the amount.  And, two, he said that

4  what's important is that family members are on the hook.

5  Now, a signature bond by a related family member, I can't

6  imagine wouldn't have the exact effect that Mr. Robinson is

7  looking for and would avoid the problems your Honor brought

8  forth with regard to Nebia Hearings, mini trials on

9  properties.

10          So if the point is to have the families on the

11 hook, then I suggest signature bonds with the requirement

12 that at least one family member is a signatory.

13          And then as to the other point that Mr. Robinson

14 made, that it's not really the amount, it's having the

15 family on the hook, well, I think that that would go,

16 specifically in Mr. Ivy's case, to the point that what's

17 important is to make sure he comes.  So if his family were

18 on the hook for something like $100,000, I think that that

19 would address both of Mr. Robinson's concerns, would avoid

20 any undue delay and more of a burden on your Honor to be

21 perfectly honest.

22          So I would suggest for Mr. Ivy, for example, a

23 $100,000 personal appearance bond secured by two signatures

24 of financially responsible adults, one of whom being

25 related.

22

1          MR. ROBINSON:  Your Honor, it would respectfully

2     be the Government's position that a $100,000 signature bond

3     is inappropriate given the fact that we directly traced over

4     twice that amount going into his account pursuant to his

5     participation in this scheme.

6          MR. BURSTEIN:  Your Honor, it wouldn't be him

7     that's on the hook.  So --

8          THE COURT:  All right.  All right.  All right.

9     The Court is going to require a $250,000 personal appearance

10    bond secured by a trust deed to the United States and the

11    co-signatures of the Defendant and the property owners, one

12    of whom shall be a family member.

13          There will be a travel restriction to the Southern

14    District of California.  Defendant shall report for

15    supervision to Pretrial Services, and he shall actively

16    maintain or seek full time employment.

17          Do I have a date for the motion hearing and trial

18    setting?

19          THE CLERK:  It's May 18th at 2:00 p.m.

20          THE COURT:  May 18 at 2:00 p.m. will be the next

21    court appearance for Mr. Ivy.

22          Now, moving on to --

23          MR. BURSTEIN:  Your Honor, is that before Judge

24    Huff?

25          THE COURT:  Yes.

23

1          Now, moving on to Mr. Gentry, Mr. Robinson?

2          MR. ROBINSON:  Yes, your Honor.  Mr. Gentry was

3  the realtor who allowed the enterprise to use his real

4  estate license in order to affect the entire fraud in this

5  case.  As opposed to Mr. Ivy, we can directly trace over

6  $1,000,000 going into his account that he benefitted from

7  his participation in the scheme.  Essentially he was paid

8  $10,000 a month flat fee by the enterprise to use his real

9  estate license, and he also made the various real estate

10 commissions off of the sale of the 220 pieces of property.

11 So the amount of money that he realized directly and

12 personally from this enterprise was significant.  And,

13 again, it was at least five times as much as Defendant

14 Michael Ivy, and our recommendation for Mr. Gentry is also a

15 bond secured by real property in the amount of $1,000,000,

16 which is what we can trace into his account from his

17 participation in this case.

18          THE COURT:  All right.  Thank you.

19          MR. BURSTEIN:  Your Honor, I think it's

20 interesting to note that Pretrial Service's recommendation

21 as to Mr. Gentry's approximately $200,000, less than their

22 recommendation was for Mr. Ivy, and I can only assume that's

23 because they've concluded that his connections to the local

24 area and to San Diego are greater and so, therefore, he

25 poses a less -- less of a risk of flight and he is more

24

1 likely to make his court appearances.

2         We would concur that that is likely to be the case

3 given his contacts to the local area and his -- the fact

4 that he resides in this District.  And, therefore, we would

5 request also a $100,000 personal appearance bond secured by

6 the signatures of two financially responsible adults, one of

7 whom being related.

8         MR. ROBINSON:  It is correct that he has

9 significant ties to this community, your Honor.  He has

10 maintained a business here for quite some time in addition

11 to his real estate business.  So I do concede the fact that

12 Mr. Gentry has significant contacts to this District.

13         THE COURT:  All right.  Thank you.

14         I neglected to indicate as to Mr. Ivy that the

15 Court will require a surety exam prior to release.

16         Court's going to require a $250,000 personal

17 appearance bond secured by a trust deed to the United States

18 and the signatures of the Defendant and the property owners,

19 one of whom shall be a family member.

20         There will be a travel restriction to the Southern

21 District of California, and Mr. Gentry shall submit to

22 pretrial supervision, and I will require an examination of

23 sureties prior to release.

24         All right.  Billie Bishop.

25         MR. ROBINSON:  Yes, your Honor.  Ms. Bishop,

Defendant number four in the indictment, is the fourth of

our principal four players in this.  The role that Ms.

Bishop played within the enterprise was that she maintained

an escrow service, and through that escrow service, she

closed on in excess of 100 of the 220 properties that we've

been able to confirm at this point.  She was perfectly aware

of the entire scope of the scheme because she was the

individual responsible for hiding from the lending

institution the kickback amount going to Bell Construction

in terms of not disclosing to the lending institutions the

fact that there was this side agreement between the buyer,

the straw buyer acting on behalf of the enterprise, and the

seller.  So she conducted in excess of 100 closings where

there was the kickback amount going to Bell Construction,

and she made a significant amount of money given her role in

the processing of all that paperwork.

As a result of that, your Honor, we are also

recommending a property bond in the amount of $200,000 for

Ms. Bishop.  I would also note for the record that her

employment is tenuous at this point because she was working

for a business called Tide Court Title.  When they were

served with a subpoena in this case and they reviewed the

files before turning them over to the United States

Government pursuant to that subpoena, she was summarily

dismissed from that company because of their independent

26

1  review of those files.

2          THE COURT:  Thank you.

3          Counsel?

4          MR. BURSTEIN:  Yes, your Honor.  Pretrial

5  Services, I think accurately, has concluded that Ms. Bishop

6  is a minimal risk of non-appearance, and she's not a danger

7  based on her familial ties here and her financial ties to

8  the community.  She's got no prior criminal history.

9  Pretrial Services has recommended a $100,000 property bond,

10 but I don't see any reason why in this case a $50,000

11 personal appearance bond secured by two signatures wouldn't

12 be more than sufficient to assure all future court

13 appearances.

14         THE COURT:  Anything further, Mr. Robinson?

15         MR. ROBINSON:  No, your Honor.  And, again, this

16 is not a situation where I'm shooting high and hoping the

17 Court comes in in the middle.  I'm making the recommendation

18 that I think is appropriate.

19         THE COURT:  The Court's going to require a

20 $150,000 personal appearance bond secured by a trust deed to

21 the United States and the signatures of the property owners,

22 one of whom shall be a family member.  It will also require

23 an examination of sureties prior to release.  There will be

24 a travel restriction to the Southern District of California.

25 Defendant shall report for supervision to Pretrial Services

27

1 and actively seek full time employment, which shall be

2 approved by her Pretrial Services officer.

3         Those will be the conditions as to Ms. Bishop.

4         All right.  Moving on to Ms. Jaime.

5         MR. ROBINSON:  Your Honor, Ms. Jaime has a unique

6 set of circumstances.  Could we address her at the end,

7 along with Daniel Williams, who is also uniquely situated in

8 this case?

9         THE COURT:  Yes.

10        MR. BURSTEIN:  Your Honor, if I could just ask is

11 there a report for Ms. Jaime?

12        THE COURT:  Excuse me?

13        MR. BURSTEIN:  Is there a Pretrial Services

14 report?  Do you know?  I don't have one.

15        THE COURT:  I have one.  Do you need another one?

16        MR. BURSTEIN:  It may have gotten misplaced.

17        THE COURT:  Well, why don't you look for it while

18 we're going on to someone else.

19        MR. BURSTEIN:  Okay.  Thank you.

20        MR. ROBINSON:  I believe next up on the list is

21 Defendant number eight, Jorge Cortez.

22        THE COURT:  Correct.

23        MR. ROBINSON:  Your Honor, Mr. Cortez's

24 participation in this was two-fold -- in this enterprise was

25 two-fold.  First, he recruited another one of the

28

1 Defendants, Jorge Magana, as a straw purchaser for a piece

2 of property.  He also prepared CPA letters, false

3 verifications of employment for a number of the straw

4 purchasers, and used that position.  He was an employee at a

5 real estate business in San Diego that was used by the

6 members of the enterprise to conduct these false

7 transactions, and he prepared personally false loan

8 applications on behalf of several straw purchasers.

9        During the time period from September the 6th,

10 2006 to May 2nd, 2007, we can document deposits into his

11 account in the amount of $59,132 in exchange for his

12 participation in the enterprise and its scheme.

13        As a result of that, the United States is

14 recommending, in accord with what Pretrial Services has

15 recommended, a $150,000 property bond.

16        THE COURT:  All right.  Thank you.

17        Counsel?

18        MR. BURSTEIN:  Yes, your Honor.  Mr. Cortez has

19 been married to his wife, Maria, for 11 years.  They have a

20 child together.  They reside locally in Chula Vista.  He has

21 a masters in education.  I don't see really any risk of non-

22 appearance here.  I would recommend a $50,000 personal

23 appearance bond secured by two signatures.  There's no

24 criminal history.  I think $50,000 would secure all future

25 court appearances.

29

1          THE COURT:  All right.  Thank you.

2          Court is going to require a $150,000 personal

3  appearance bond secured by the co-signatures of two

4  financially responsible adults.  Not requiring property in

5  this case.  One of the sureties must be a family member.

6  Further conditions of the bond will be a travel restriction

7  to the Southern District.  Defendant shall report for

8  supervision to Pretrial Services and actively seek or

9  maintain full time employment.

10          MR. BURSTEIN:  Yes, your Honor.

11          THE COURT:  Those will be the conditions for Jorge

12  Cortez.

13          MR. ROBINSON:  Next is Defendant number 10, Lorena

14  Callu, and her participation in the scheme was as a member

15  of the office staff at one of the real estate offices that

16  was used by the enterprise.  As such, she filled out the

17  false loan applications on behalf of the straw purchasers.

18  Moreover, Ms. Callu used her husband's legitimate company,

19  Callu Engineering, as a false employer for a number of the

20  straw purchasers.  So, essentially, the straw purchaser

21  would come in, falsify their employment, falsify their

22  income, and one of the employers that was used in that

23  context was Ms. Callu's husband's legitimate place of

24  employment, Callu Engineering.

25          Accordingly, the Government would make the same

30

1  recommendation in accord with Pretrial Services, actually,

2  $50,000 less than Pretrial Services, a $150,000 property

3  bond.

4          THE COURT:  All right.  Thank you.

5          MR. BURSTEIN:  Your Honor, I would note that Ms.

6  Callu has been married to her husband for 25 years.  They

7  have three children together, and they also reside locally

8  in San Diego, actually in Chula Vista, your Honor.  I think

9  that $150,000 amount may be okay, but I would suggest that a

10 personal appearance bond secured by two signatures would be

11 sufficient to secure all future court appearances.

12         THE COURT:  All right.  Thank you.

13         Court is going to require a $150,000 personal

14 appearance bond secured by the co-signatures of two

15 financially responsible adults, one of whom is a family

16 member.  There will be a travel restriction to the Southern

17 District.  Defendant shall actively seek and maintain or

18 maintain full time employment.  Those will be the conditions

19 with regard to Ms. Callu.

20         I believe Mr. Anton Ewing is next.

21         MR. ROBINSON:  Yes, your Honor.  Mr. Ewing,

22 Defendant number 11, his role in the -- his role in the

23 enterprise was to prepare false CPA letters and letters of

24 employment verification.  For example, for one of the straw

25 purchasers who was an unemployed 20-year-old student at the

31

1  time, he wrote a letter falsely verifying that individual's

2  employment.  So his participation was limited to the

3  generation -- generating those particular letters and

4  documenting false employment for the straw purchasers, but

5  that was a critical piece of information for the lenders in

6  terms of determining whether or not the applicants for these

7  loans that exceeded the value of the home were, in fact,

8  legitimate applications.  So he backstopped the straw

9  purchasers when they falsified the information to the

10  lending institutions.

11          I would also note that he is a certified public

12  accountant.  He has his JD, but he's not licensed to

13  practice law in the State of California, and he has also

14  been deemed a vexatious litigant, having been party to 38

15  civil and domestic suits filed in San Diego Superior Court

16  between 2004 and 2009, and he's currently defending against

17  five harassment suits that have been filed against him.

18          THE COURT:  All right.  Thank you.

19          MR. BURSTEIN:  Well, your Honor, Mr. Ewing also,

20  he resides here in Rancho Santa Fe with his wife.  They have

21  one child who's two and a half years old.  According to the

22  Government, he likes to come to court.  So I don't think

23  that there is a real risk of non-appearance here.  So I

24  would suggest that a $50,000 personal appearance bond

25  secured by the signatures of two financially responsible

32

1  adults would be sufficient.

2          MR. ROBINSON:  Your Honor, I failed to give the

3  Government's recommendation.  We are in accord with Pretrial

4  Services, who is recommending $200,000 secured by real

5  property.  He did have a -- I believe it was in excess of

6  5,000 square foot home that was searched at the time of his

7  arrest in Rancho Santa Fe.

8          MR. BURSTEIN:  That's just another reason for him

9  not to flee, your Honor.

10         MR. ROBINSON:  He's not the owner of that home.

11 He was a renter.

12         THE COURT:  The Court is going to require a

13 $100,000 personal appearance bond secured by the signatures

14 of two financially responsible adults, one family member.

15 There will be a travel restriction to the Southern District.

16 Defendant shall actively seek and maintain full time

17 employment.  Any new employment shall be approved by his

18 Pretrial Services officer.

19         MR. BURSTEIN:  Your Honor, may I ask for -- just

20 as to the travel restriction, it's my understanding that he

21 has substantial family around the Bay Area.  So if your

22 Honor would be willing, I don't know if the Government has a

23 problem with that, to extend the travel restrictions up

24 through I guess the Northern District or in the State of

25 California.

33

1           THE COURT:  Any objection?

2           MR. ROBINSON:  No, your Honor.

3           MS. GARZA:  Naomi Garza with Pretrial Services.

4   The Defendant has an active restraining order.  Just to note

5   that he should abide by the restraining order.

6           THE COURT:  Thank you.  Defendant shall abide by

7   the conditions of his restraining order, and I will expand

8   the travel condition to include the State of California.

9           MR. BURSTEIN:  Thank you, your Honor.

10          THE COURT:  You're welcome.

11          All right.  Next, Dennis Tapia.

12          MR. ROBINSON:  Yes, your Honor.  With the

13  exception that Mr. Tapia is neither a CPA or an individual

14  with a JD degree, he had a role very similar to that of Mr.

15  Ewing that we just covered in terms of providing the false

16  CPA letters and verbal verifications of employment for some

17  of the straw purchasers in this scheme, and we would be

18  making the same recommendation with respect to Mr. Tapia.

19          THE COURT:  All right.

20          MR. BURSTEIN:  And, your Honor, we would concur

21  with Pretrial Service that a $20,000 personal appearance

22  bond with two financially responsible adults would be

23  sufficient in this case.  He's been married for 26 years.

24  He's got four children.  He lives in Oceanside.  We concur

25  with Pretrial Services' recommendation.

34

1        THE COURT:  The Court is going to require a

2  $50,000 personal appearance bond, secured by the co-

3  signatures of two financially responsible adults, one family

4  member.  There will be a travel restriction to the Southern

5  District.  Defendant shall actively seek and maintain full

6  time employment.

7        MR. BURSTEIN:  Can we extend to the Central

8  District in this case, your Honor?  There's substantial

9  family in the Los Angeles area is my understanding.

10        THE COURT:  Any objection?

11        MR. ROBINSON:  No, your Honor.

12        THE COURT:  All right.  Travel condition will

13  include the Central District of California.  Those will be

14  the conditions for Mr. Tapia.

15        Now Ms. Desiree Holiday.

16        MR. ROBINSON:  Your Honor, the United States moved

17  for detention as to Ms. Holiday.

18        THE COURT:  I apologize.  You're right.

19        MR. BURSTEIN:  That was just flight, correct?

20        MR. ROBINSON:  Yes.

21        THE COURT:  So --

22        MR. ROBINSON:  There are three remaining

23  Defendants, Jorge Magana --

24        THE COURT:  Jorge Magana --

25        MR. ROBINSON:  -- Nicoele Watson, and Daniel

35

1  Williams, and with the Court's permission and for purposes

2  of making this a little more brief, I'll address all three

3  at the same time.  They had the same role in the conspiracy

4  itself.

5          THE COURT:  All right.

6          MR. ROBINSON:  All of those individuals acted as

7  straw purchasers for various pieces of property, providing

8  false employment information on their loan applications to

9  secure those multiple pieces of property within a short time

10  frame.  All of the properties purchased by those three

11  Defendants have gone into foreclosure, resulting in a

12  significant loss to the bank.

13          With respect to Jorge Magana, Defendant number 22,

14  we've identified three properties that he purchased.

15  Nicoele Watson purchased five properties on behalf of the

16  enterprise, and Daniel Williams purchased three properties.

17  So three, five, and three for the last three Defendants.

18          As to the amount of money that they were paid for

19  their participation, we can show $48,000 wire transfer to

20  Defendant number 22, Jorge Magana.  So basically that's his

21  portion of the kickback amount that went to Bell

22  Construction.  So he was paid for being the straw purchaser

23  on those pieces of property.  The same would hold true for

24  Nicoele Watson, who we can show was paid at least $106,000

25  in exchange for being the straw purchaser on her five pieces

36

1  of property, and Defendant number 24 has estimated himself

2  that he made in excess of $100,000 in exchange for his role

3  in the enterprise purchasing those properties on behalf of

4  the enterprise.

5          As a result of those monetary amounts, we would

6  ask that each of those Defendants be released on a condition

7  that they provide a signature bond in the amount of

8  $100,000.

9          THE COURT:  All right.  Thank you.

10         Counsel?

11         MR. BURSTEIN:  Your Honor, unfortunately, I didn't

12 have the benefit of all the advanced information.  So I'm

13 going to have to go one at a time.

14         THE COURT:  That's fine.

15         MR. BURSTEIN:  Okay.

16         THE COURT:  Begin with Mr. Magana if you would,

17 please.

18         MR. BURSTEIN:  Okay.  Yes.  As to Mr. Magana, your

19 Honor, my information indicates that he's been married for

20 the last 19 years to his wife Blanca.  They have three

21 children together who are all United States citizens.  He

22 resides in National City, California.  It seems that the

23 Government's indicated that his role, to whatever extent he

24 was involved is even allegedly minor.  So I would suggest in

25 this case that a $50,000 personal appearance bond would be

37

1  sufficient.

2       MR. ROBINSON:  If I said the word minor, I

3  misspoke.  It was not minor.  He was an important part of

4  this whole enterprise.  He clearly did not represent the

5  full scope of the enterprise, but his participation was

6  critical.  So I didn't mean to characterize him as minor.

7       THE COURT:  All right.

8       And, Mr. Robinson, you said he made at least

9  $100,000?

10      MR. ROBINSON:  No, your Honor.  We can show a

11 $48,000 wire transfer into his account.  And, again, the

12 monetary amounts that I'm addressing are only those that we

13 can prove via wire transfer or a check going in and out of

14 somebody's account and is not included within that amount

15 the cash payments that were made.

16      THE COURT:  All right.  The Court's going to

17 require a $50,000 personal appearance bond secured by the

18 co-signatures of two financially responsible adults, one

19 family member.  There will be a travel restriction to the

20 Southern District.  Defendant shall actively seek and

21 maintain full time employment.  Those will be the conditions

22 for Mr. Magana.

23      Mr. Robinson?

24      MR. ROBINSON:  Yes, your Honor.  With respect to

25 Nicoele Watson, just drawing the Court's attention to my

38

1  earlier proffer, she benefitted in the amount of $106,000,

2  and that's the amount that we can show going into her

3  account for her purchase of five pieces of property, the

4  fraudulent purchase of five pieces of property, all of which

5  have been foreclosed.

6          THE COURT:  All right.  Thank you.

7          MR. BURSTEIN:  Yes, your Honor.  Ms. Watson is a

8  United States citizen.  She resides in San Diego.  She has

9  one child who's 13 years old.  I think Pretrial Services

10 recommends a personal appearance bond in this case of

11 $50,000 secured by two financially responsible adults'

12 signatures, and we would concur with that.

13         THE COURT:  All right.  Thank you.

14         The Court is going to require a $50,000 personal

15 appearance bond secured by the co-signatures of two

16 financially responsible adults, one of whom shall be a

17 family member.  There will be a travel restriction to the

18 Southern and Central Districts of California.  Defendant

19 shall actively seek and maintain full time employment.

20 Those will be the conditions for Nicoele Watson.

21         MR. ROBINSON:  The final Defendant, your Honor,

22 Daniel Williams, we would be making the same recommendations

23 that the Court just set for Ms. Watson.  He was a straw

24 purchaser on three pieces of property, and given the nature

25 of his current employment, his housing conditions at the MCC

39

1  are not optimal.

2            THE COURT:  All right.  Thank you.

3            Counsel?

4            MR. BURSTEIN:  We would concur that a $50,000

5  personal appearance bond would be sufficient.  We would note

6  that all of his connections are really to San Diego here,

7  your Honor.

8            THE COURT:  The Court is going to require a

9  $50,000 personal appearance bond secured by the co-

10 signatures of two financially responsible adults, one being

11 a family member.  There will be a travel restriction to the

12 Southern District.  The Court is going to require that Mr.

13 Williams surrender all of his firearms.

14           Let me ask our Pretrial Services officer where you

15 want those firearms to go?

16           MS. GARZA:  Your Honor, we would request that the

17 firearms be surrendered to a gun dealer.

18           THE COURT:  A gun dealer?

19           MS. GARZA:  Your Honor, usually we have -- so that

20 they make a transaction (indiscernible) to either sell the

21 gun or transfer it to a dealer or transfer it to a different

22 owner so there's no (indiscernible) professional or

23 ownership of the weapon.

24           THE COURT:  All right.  Well, the condition is

25 going to be that the Defendant surrender his firearms in

40

1  accordance with conditions set by Pretrial Services for the

2  surrender of those weapons.

3          MS. GARZA:  That will be fine, your Honor.

4          THE COURT:  All right.  Those will be the

5  conditions as to Mr. Daniel Williams.

6          MR. ROBINSON:  Your Honor, if we can go back to

7  Ms. Jaime, who we passed over.

8          THE COURT:  Yes.

9          MR. BURSTEIN:  I still don't have a sheet,

10  unfortunately, your Honor.  I looked, and I don't see it.

11          MS. GARZA:  We can provide an original copy, your

12  Honor.

13          THE COURT:  All right.  Thank you.

14          MR. ROBINSON:  Your Honor, Ms. Jaime was an

15  employee at one of the real estate businesses that was used

16  by the enterprise to fraudulently purchase the properties at

17  issue in this case.  She processed false loan applications

18  and was also someone who verified falsely employment for the

19  straw purchasers.  She was heavily involved in the

20  conspiracy.  However, I mentioned before that she has

21  special circumstances.  I believe she's seven months

22  pregnant at this point, and she does have significant ties

23  to the Southern District of California.

24          We would, therefore, be recommending a $50,000

25  signature bond.

41

1          THE COURT:  All right.  Thank you.

2          Do you have a copy of the Pretrial Services

3   Report?

4          MR. ROBINSON:  Yes.

5          THE COURT:  Thank you.

6          MR. BURSTEIN:  We concur with the Government, your

7   Honor.

8          THE COURT:  All right.

9          Court will require a $50,000 personal appearance

10   bond secured by the co-signatures of two financially

11   responsible adults, one being a family member.  There will

12   be a travel restriction to the Southern District.  Defendant

13   shall -- well, she shall seek employment if she's physically

14   capable.  Those will be the conditions of the bond with

15   regard to Ms. Jaime.

16          All right.  The next court appearance for the

17   remaining individuals will be for detention hearing next

18   Wednesday morning at 9:00 o'clock.

19          MR. BURSTEIN:  Thank you, your Honor.

20          THE COURT:  Thank you.  Thank you, ladies and

21   gentlemen.

22       (Proceedings concluded.)

23

24

25

42

1          I certify that the foregoing is a correct

2   transcript from the electronic sound recording of the

3   proceedings in the above-entitled matter.

4

5   /s/Jordan Keilty              5/11/09
    Transcriber                   Date
6
    FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8   /s/L.L. Francisco
    L.L. Francisco, President
9   Echo Reporting, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*